**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **EDMUND SANTOS**, individually and on behalf of others similarly situated,<br>Plaintiff,<br>v.<br>**FIDELITY INVESTMENTS,**<br>Defendant. | File No.<br>**CLASS ACTION COMPLAINT**<br>JURY TRIAL DEMANDED |

Plaintiff EDMUND SANTOS, individually and on behalf of the Class defined below of similarly situated persons, allege the following against FIDELITY INVESTMENTS ("Fidelity" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## SUMMARY OF THE CASE

1. This case involves the unauthorized breach of Defendant's information technology systems announced on October 9, 2024, wherein—from August 17, 2024 to August 19, 2024—the personal identifiable information ("PII") of roughly 77,000 individuals was exposed due to a flaw in Defendant's information technology systems, which allowed hackers and other bad actors to obtain individuals' PII for unsavory and illegal purposes (the "Data Breach").

2. Among those affected by the Data Breach includes customers of Defendant, whose PII was compromised, including Social Security numbers, Fidelity account numbers, and non-Fidelity account numbers ("Private Information").

3. This Class Action Complaint is filed on behalf of all affected persons in the United States, described more fully in the following sections, whose PII was compromised in the Data Breach.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of Class Members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

5. This Court has jurisdiction over Defendant because Defendant has availed itself of the rights and benefits of the State of Massachusetts by engaging in activities including (i) directly and/or through its parent companies, affiliates and/or agents providing services throughout the United States in this judicial district and abroad; (ii) conducting substantial business in this forum; (iii) maintaining headquarters in Massachusetts; and (iv) perpetrating tortious acts in Massachusetts.

6. Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant operates in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Defendant collecting and/or storing the PII of Plaintiff and Class Members.

## PARTIES

### A. Plaintiff Edmund Santos

7. Plaintiff Edmund Santos is an adult individual and citizen of New York.

### B. Defendant Fidelity Investments

8. Defendant Fidelity is incorporated in Massachusetts, with its principal place of business located at 245 Summer Street, Boston, MA 02210.

## FACTUAL ALLEGATIONS

### A. Fidelity's Business and Data Collection Practices

9. Fidelity is one of the biggest mutual fund companies in the United States and provides services for, *inter alia*, retirement investment, cryptocurrency, trading, and asset management.[1]

10. To use Defendant's investment services, individuals—including Plaintiff and Class Members—are required to hand over and entrust their PII to Defendant.

11. Defendant collected the PII of Plaintiff and Class Members and stored it, unencrypted, on Defendant's internet-accessible network.

12. Plaintiff and Class Members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII.

13. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties.

### B. The Data Breach

14. On October 9, 2024, Fidelity reported the Data Breach to the Massachusetts Office of Consumer Affairs and Business Regulation, confirming that, of the individuals affected, 2,768 are Massachusetts residents.[2]

---

[1] *Home Page*, Fidelity Investments, https://www.fidelity.com/ (last accessed Oct. 30, 2024)
[2] *Data Breach Notification Report*, Commonwealth of Mass. (Oct. 9, 2024), https://www.mass.gov/doc/data-breach-report-2024/download (last accessed Oct. 30, 2024).

15. On October 9, 2024, Fidelity posted on the website of the Massachusetts government website a template "Notice of Data Breach", which states the following:

> We, Fidelity Investments ("Fidelity"), are contacting you to notify you of a data security incident that involved some of your personal information. We take the protection of your information very seriously and are reaching out to let you know what happened and the steps we have taken, and to provide you with additional information and services that may be helpful to you.
>
> **What Happened?** Between August 17 and August 19, a third party accessed and obtained certain information without authorization using two customer accounts that they had recently established. We detected this activity on August 19 and immediately took steps to terminate the access. An investigation was promptly launched with assistance from external security experts. The information obtained by the third party related to a small subset of our customers. Please note that this incident did not involve any access to your Fidelity account(s).
>
> **What Information Was Involved?** We recently completed our review of the impacted information and determined that the following personal information related to you was among the information retrieved: [Breach Elements].
>
> **What We Are Doing.** We take this incident and the security of your information very seriously. As noted above, upon detecting this activity, we promptly took steps to terminate the activity and address this incident.
>
> Although we are not aware of any misuse of your personal information obtained because of this incident, we have arranged for you to enroll, at your option, in a credit monitoring and identity restoration service for 24 months at no cost to you. This service allows you to monitor your credit reports and to detect any unusual activity that may affect your personal financial situation. The service is provided by TransUnion Interactive, a subsidiary of TransUnion®, one of the three nationwide credit reporting companies. If you decide to enroll, please refer to the enclosed Credit Monitoring Instruction Sheet.
>
> **What You Can Do.** In addition to enrolling in the credit monitoring and identity restoration services it is always a good idea to remain vigilant for fraudulent activity or identity theft by regularly reviewing your statements for your financial and other accounts, monitoring your credit reports, and promptly reporting any suspicious activity to your financial institution (if applicable), local law enforcement, or your appropriate state authority. For additional information about ways to protect yourself, please refer to the enclosed "Additional Steps to Protect Yourself".[3]

[3] *Notice of Data Breach*, Commonwealth of Mass. (Oct. 9, 2024), https://www.mass.gov/doc/2024-1895-new-york-life-insurance-and-annuity-corporation/download (last accessed Oct. 30, 2024)

16. Upon information and belief, the PII of about 77,000 individuals were affected by the Data Breach.[4]

17. Upon information and belief, the PII collected by Defendant and compromised by the Data Breach is that of Defendant's customers using Defendant's wide array of investment-related services.

18. Omitted from the Notice of Data Breach are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff or Class Members, who retain a vested interest in ensuring that their PII remains protected.

19. Thus, Defendant's "disclosure" of the Data Breach amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class members of the Data Breach's critical facts. Without these details, Plaintiff's and Class members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

20. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

21. The attacker accessed and acquired files containing unencrypted PII of Plaintiff and Class Members, including their Social Security numbers, Fidelity account numbers, and 'non-Fidelity account numbers'. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

---

[4] *Data Breach Notifications*, Maine Atty. Gen. (Oct. 9, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a4103ed8-3176-4ca0-99e6-4a320f1c3b32.html?7194ef805fa2d04b0f7e8c9521f97343 (last accessed Oct. 30, 2024)

22. Plaintiff further believes that his PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**C. The Value of PII**

23. In April 2020, ZDNet reported in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for complaints as revenge against those who refuse to pay."[5]

24. In October 2023, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "malicious actors have adjusted their ransomware tactics to be more destructive and impactful and have also exfiltrated victim data and pressured victims to pay by threatening to release the stolen data."[6]

25. Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

26. Malicious actors can use stolen personal information to, *inter alia*, create synthetic identities (which are harder for authorities to detect), execute credible phishing attacks, and sell the personal information on underground markets in the dark web.[7]

27. Another example is when the U.S. Department of Justice announced its seizure

---

[5] Ransomware mentioned in 1,000+ SEC filings over the past year, ZDNet (Apr. 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed Oct. 31, 2024)
[6] *See StopRansomware Guide*, U.S. Cybersec. and Infrastructure Sec. Agency (Oct. 2023), https://www.cisa.gov/sites/default/files/2023-10/StopRansomware-Guide-508C-v3_1.pdf. (last accessed Oct. 31, 2024)
[7] *What Data Do Cybercriminals Steal? (How To Protect Yours)*, Identity Guard (Feb. 14, 2024), https://www.identityguard.com/news/what-information-do-cyber-criminals-steal. (last accessed Oct. 31, 2024)

of RaidForums in 2022. RaidForums was an online marketplace popular for cybercriminals to purchase and sell hacked data belonging to millions of individuals around the world.[8] "One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[9]

28. The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. According to Prey, a company that develops device tracking and recovery software, stolen PII and can be worth up to $2,000.00 depending on the type of information obtained.[10]

29. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. Such fraudulent uses include opening fraudulent credit cards and bank accounts, filing or collecting tax returns, accessing government benefits, applying for loans, and receiving healthcare. "If not spotted and resolved, these types of identity theft can rack up financial debt and do extensive damage to a person's credit, making things like obtaining a loan to buy a car or house difficult or even impossible."[11]

---

[8] *United States Leads Seizure of One of the World's Largest Hacker Forums and Arrests Administrator*, U.S. Dept. of Justice (Apr. 12, 2022), https://www.justice.gov/opa/pr/united-states-leads-seizure-one-world-s-largest-hacker-forums-and-arrests-administrator. (last accessed Oct. 31, 2024)

[9] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/. (last accessed Oct. 31, 2024)

[10] Juan Hernandez, *The Lifecycle of Stolen Credentials on the Dark Web*, Prey (Feb. 26, 2024), https://preyproject.com/blog/lifecycle-stolen-credentials-dark-web. (last accessed Oct. 31, 2024)

[11] *What to do if someone has your Social Security number*, AllState (Jan. 24, 2024), https://www.allstateidentityprotection.com/content-hub/stolen-social-security-number. (last accessed Oct. 31, 2024)

30. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

31. Even then, a new Social Security number may not be effective. "When issuing a new SSN, the Social Security Administration (SSA) links your old number to your new one so you'll still be associated with all wages earned."[12]

32. Because of this, the information compromised in the Data Breach here is significantly more harmful to lose than other types of data because the information compromised in this Data Breach is difficult, if not impossible, to change.

33. The PII compromised in the Data Breach also demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[13]

34. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends and colleagues of the original victim.

35. According to the FBI's Internet Crime Complaint Center (IC3) 2023 Internet

[12] *What Happens if I Change My Social Security Number*, LendingTree (Mar. 15, 2023), https://www.lendingtree.com/credit-repair/credit-score-after-getting-a-new-social-security-number/. (last accessed Oct. 31, 2024)

[13] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells- for- 10x- price-of-stolen-credit-card-numbers.html (last accessed Oct. 31, 2024)

Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $12.5 billion in losses to individuals and business victims.[14]

36. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

37. Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

38. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[16]

39. The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm (including identity theft) that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-

---

[14] *2023 Internet Crime Report*, Fed. Bureau of Investig. (2023), https://www.ic3.gov/Media/PDF/AnnualReport/2023_IC3Report.pdf (last accessed Oct. 31, 2024)
[15] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last accessed Oct. 31, 2024)
[16] *Id*.

party cybercriminals to profit off of this highly sensitive information.

**D. Defendant Failed to Comply with the FTC Act and Failed to Observe Reasonable and Adequate Date Security Measures**

40. The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[17]

41. Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[18]

42. The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

43. The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for

[17] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf. (last accessed Oct. 31, 2024)

[18] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited April 17, 2024). (last accessed Oct. 31, 2024)

suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[19]

44. The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

45. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

46. Plaintiff and Class Members gave their PII to Defendant with the reasonable expectation and understanding that Defendant would comply with its duty to keep such information confidential and secure from unauthorized access.

47. Defendant states in its "Privacy Policy" the following regarding its supposed commitment to protecting the PII of its customers:

> **How we protect information about you**
> We implement and maintain physical, administrative, technical and organizational measures designed to protect personal information and we regularly adapt these controls to respond to changing requirements and advances in technology.
>
> At Fidelity, we restrict access to personal information to those who require it to develop, support, offer and deliver products and services to you and to operate our business.[20]

[19] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf. (last accessed Oct. 31, 2024)

[20] *Privacy Policy*, Fidelity Investments (Aug. 2024), https://www.fidelity.com/privacy-policy (last accessed Oct. 30, 2024).

48. Additionally, Defendant claims the following on its website about the security of the accounts of Fidelity customers:

> **We're committed to your security**
>
> We safeguard your accounts with strong encryption, firewalls, secure email, and proactive 24/7 system surveillance.[21]

49. Defendant also represents that it imposed "extra security measures" to protect its customers from fraud, as described below:



[22]

50. When a user clicks on the "See more of our security measures" hyperlink (as shown in the above screenshot), the user is taken to another part of Fidelity's website in which Fidelity claims to impose the following security measures:

> With a dedicated team of cybersecurity professionals and security integrated into our business, technology, and culture, Fidelity's cybersecurity program meets high standards and has achieved multiple industry certifications. We continuously monitor the environment to evolve our program to guard against the latest threats as well as meet our customers' and clients' changing needs.
>
> **<u>Protecting our networks and your data</u>**

---

[21] *Security*, Fidelity Investments, https://www.fidelity.com/security/overview (last accessed Oct. 30, 2024).
[22] *Id*.

An extensive range of safeguards, multiple layers of security, and 24/7 surveillance are in place to secure our networks, and customers' data and interactions with us. By design, some protections are visible and some are not.

**Network security**

Fidelity implements a large number of industry standard network security controls including but not limited to firewalls, intrusion detection systems, proxy servers, advanced anti-malware, and denial of service protection.

**At our offices**

We vigilantly monitor all work areas to prevent theft or unauthorized use of your sensitive information. In addition, authorized persons can only enter work areas through use of a security badge. Professional security personnel staff Fidelity offices, campuses, and data centers 7 days a week, 24 hours a day

**Associate education**

Our holistic approach to security includes making sure our associates understand their role in protecting our company and customer accounts, and adhere to our security policies. We require regular training for all personnel on data protection, and specialized training for certain roles. Our associates who work directly with customers receive extra education on the latest methods used by criminals to commit identity theft and fraud.

**Legal and regulatory compliance**

Fidelity has corporate-level policies and procedures designed to ensure awareness of and compliance with applicable technology, security, and privacy laws, regulations, and to align internal policies, controls, and actions to address those requirements.

...

**<u>Safeguarding your accounts</u>**

Protecting customer accounts is a top priority for Fidelity, and there are actions you can take to further strengthen your account security. Visit your security settings to review your personal security checklist.

**Account monitoring and protection**

No matter where you visit us, we always verify your identity before allowing access to your accounts. We monitor all transactions for suspicious or unusual behavior and help you keep an eye on your account activity with automated alerts. Customers are strongly encouraged to add an extra layer of protection to your account by enabling multi-factor authentication (MFA).

**Never respond to unsolicited requests for information**

Fidelity will never contact you through unsolicited communications to ask for your personal information, such as login credentials or a security code you've received

> via text or call. Never voluntarily give this information to anyone unless you initiated contact with us through our official channels.
>
> **More options to protect your accounts**
> Visit your security settings to add MFA to your account, update your password, manage your trusted devices, lockdown electronic money movement, and more.[23]

51. In spite of the abovementioned data privacy and security representations made by Defendant in its online Privacy Policy and security documentation, the occurrence of the Data Breach demonstrates that Defendant actually did not impose measures sufficient to maintain the privacy and security of its customers' PII.

52. On its website, Defendant posts a "Fidelity Customer Protection Guarantee," under which Defendant promises the following:

> **Fidelity Customer Protection Guarantee**
>
> We're proud of the trust you place in Fidelity and want to ensure that you have peace of mind when doing business with us. That's why we offer this guarantee: We will reimburse you for any financial losses that result from unauthorized activity on your accounts.[24]

53. Defendant has been on notice for years that Plaintiff's and Class Members' PII was a target for bad actors because of, among other motives, the high value of the PII created, collected, and maintained by Defendant.

54. Despite such awareness, Defendant failed to impose and maintain reasonable and appropriate data security controls to protect Plaintiff's and Class Members' PII from unauthorized access that Defendant should have anticipated and guarded against.

55. Defendant was fully aware of its obligation to protect the PII of its customers because of its collection, storage, and maintenance of PII. Defendant was also aware of the

---

[23] *Our security measures*, Fidelity Investments, https://www.fidelity.com/security/our-security-measures (last accessed Oct. 30, 2024)

[24] *Security*, Fidelity Investments, https://www.fidelity.com/security/overview (last accessed Oct. 30, 2024).

significant consequences that would ensue if it failed to do so because Defendant collected, stored, and maintained sensitive private information from millions of individuals and knew that this information, if hacked, would result in injury to Plaintiff and Class Members.

56. Despite understanding the consequences of insufficient data security, Defendant failed to adequately protect Plaintiff's and Class Members' PII, permitting bad actors to access and misuse it.

**E. Defendant Failed to Comply with Industry Standards**

57. Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[25] All organizations collecting and handling PII, such as Defendant, are strongly encouraged to follow these controls.

58. Further, the CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, HIPAA, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[26]

59. Several best practices have been identified that a minimum should be implemented by companies like Defendant, including but not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining

[25] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), available at https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last accessed Oct. 31, 2024)
[26] *See CIS Benchmarks FAQ*, Center for Internet Security, https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/ (last accessed Oct. 31, 2024)

network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.[27]

60. Other best practices have been identified that a minimum should be implemented by companies like Defendant, including but not limited to ensuring that PII is only shared with third parties when reasonably necessary and that those vendors have appropriate cybersecurity systems and protocols in place.[28]

61. Defendant failed to follow these and other industry standards to adequately protect the PII of Plaintiff and Class Members.

**F. The Data Breach Caused Harm and Will Result in Additional Fraud**

62. Without detailed disclosure to the victims of the Data Breach, individuals whose PII was compromised by the Data Breach, including Plaintiff and Class Members, were unknowingly and unwittingly exposed to continued misuse and ongoing risk of misuse of their PII for months without being able to take available precautions to prevent imminent harm.

63. The ramifications of Defendant's failure to secure Plaintiff's and Class Members' data are severe.

64. Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. This conclusion is based on an analysis of four years of data that correlated each year's data breach victims with those who also reported being victims of identity fraud.

65. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[29] The FTC describes "identifying

[27] *See* Center for Internet Security, *Critical Security Controls* (May 2021), available at https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last accessed Oct. 31, 2024)
[28] *See id*.
[29] 17 C.F.R § 248.201 (2013).

information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[30]

66. Identity thieves can use PII, such as that of Plaintiff and Class Members, which Defendant failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

67. As demonstrated herein, these and other instances of fraudulent misuse of the compromised PII has already occurred and are likely to continue.

68. As a result of Defendant's delay between the Data Breach in August 2024 and the notice of the Data Breach sent to affected persons in October 2024, the risk of fraud for Plaintiff and Class Members increased exponentially.

69. Javelin Strategy and Research reports that identity thieves have stolen $43 billion in 2022.[31]

70. Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. According to Experian, a credit monitoring company, "it takes an average of six months and roughly 200 hours of work to recover your identity after it's been compromised."[32]

---

[30] *Id.*

[31] *See Identity Fraud Losses Totaled $43 Billion in 2022, Affecting 40 Million U.S. Adults*, Javelin (Mar. 28, 2023), https://javelinstrategy.com/press-release/identity-fraud-losses-totaled-43-billion-2022-affecting-40-million-us-adults (last accessed Oct. 31, 2024)

[32] Gayle Soto, *The Unexpected Costs of Identity Theft*, Experian (Sept. 30, 2020), https://www.experian.com/blogs/ask-experian/what-are-unexpected-costs-of-identity-theft/ (last accessed Oct. 31, 2024)

71. There may be a time lag between when harm occurs versus when it is discovered, and also between when private information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

72. Thus, Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

**G. Plaintiff's Experience with the Data Breach**

73. To use Defendant's investment services Plaintiff Edmund Santos, a Fidelity customer, was required to and did provide his PII to Defendant—including his Social Security number. Upon information and belief, that PII was stored and maintained by Defendant.

74. Plaintiff received a "Notice of Data Breach" from Defendant—dated October 9, 2024—notifying him of the Data Breach and of the unauthorized exposure of his PII, including his Social Security number, Fidelity account numbers, and non-Fidelity account numbers.

75. Plaintiff values his privacy and makes every effort to keep his personal information private.

76. After learning of the Data Breach and out of concern for his identity, Plaintiff imposed a freeze on his credit with three credit bureaus.

77. Following the Data Breach, Plaintiff Santos also placed a lock on his Social Security number.

[33] GAO, *Report to Congressional Requesters*, at 29 (June 2007), available at http://www.gao.gov/new.items/d07737.pdf (last accessed Oct. 31, 2024)

78. Furthermore, after the Data Breach, Plaintiff Santos imposed a freeze on outgoing funds from his Fidelity accounts.

79. Additionally, following the Data Breach, Plaintiff Santos has enrolled in identity protection.

80. Upon information and belief, Plaintiff Santos has also received information that, since the Data Breach, his PII is on the dark web.

81. Since the Data Breach, Plaintiff has experienced a significant increase in the frequency of spam telephone calls and emails from individuals who have clearly obtained his private information.

82. Plaintiff is now forced to live with the anxiety that his PII is being disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving his of any right to privacy whatsoever.

83. As a result of the Data Breach, Plaintiff has had to spend over five (5) hours dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of: monitoring his accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; locking his credit account with Experian, TransUnion, and Equifax after finding out that his PII was detected on the dark web; and going to and consulting his bank about the Data Breach, potential data theft and precautions to be taken.

84. Plaintiff remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in his name, medical services billed in his name, tax return fraud, utility bills opened in his name, credit card fraud, and similar identity theft.

**H. Plaintiff and Class Members Suffered Damages**

85. The Data Breach was a direct and proximate result of Defendant's failure to properly safeguard and protect Plaintiff's and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Defendant's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

86. Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it would have prevented intrusion into its information storage and security systems and, ultimately, the theft of the PII of over 77,000 individuals.

87. As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting Data Breach, Plaintiff and Class Members have already been harmed by the fraudulent misuse of their PII, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, *inter alia*, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam email, text, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

88. Defendant's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a. theft and misuse of their personal and financial information;

b. the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and misused via the sale of Plaintiff's and Class Members' information on the Internet's black market;

c. the untimely and inadequate notification of the Data Breach;

d. the improper disclosure of their PII;

e. loss of privacy;

f. ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

g. ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market; and,

h. the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

89. While Plaintiff's and Class Members' PII has been stolen, Defendant continues to hold Plaintiff's and Class Members' PII. Particularly because Defendant has demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiff and Class Members have an undeniable interest in ensuring that their PII is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

## CLASS ALLEGATIONS

90. Plaintiff brings this class action individually and on behalf of all members of the following Class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following Class:

> **All persons residing in the United States whose PII was compromised in the Data Breach announced by Fidelity on or about October 9, 2024, including all who were sent a notice of the Data Breach**.

91. Excluded from the class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendant has a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

92. Plaintiff reserves the right to modify or amend the foregoing class definitions before the Court determines whether certification is appropriate.

93. Numerosity: The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. As noted above, it has been reported that approximately 77,000 individuals' information was exposed in the Data Breach.

94. Commonality and Predominance: Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

c. Whether Defendant's computer systems and data security practices used to protect Plaintiff's and Class Members' PII violated the FTC Act and/or state laws, and/or Defendant's other duties discussed herein;

d. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

e. Whether Defendant unlawfully shared, lost, or disclosed Plaintiff's and Class Members' PII;

f. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Plaintiff and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

i. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII;

j. Whether Defendant breached duties to protect Plaintiff's and Class Members' PII;

k. Whether Defendant's actions and inactions alleged herein were negligent;

l. Whether Defendant was unjustly enriched by its conduct as alleged herein;

m. Whether an implied contract existed between Class Members and Defendant with respect to protecting PII and privacy, and whether that contract was breached;

n. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

o. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

p. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

95. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of himself and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

96. Typicality: Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the class, had his PII compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

97. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Class and has no interests adverse to, or

conflict with, the class(es) he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

98. Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

99. Particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above.

100. Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the class.

101. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

102. Plaintiff restates and realleges paragraphs 1 through 101 above as if fully set forth herein.

103. Defendant required Plaintiff and Class Members to provide it with PII in order to receive Defendant's products and services.

104. By collecting and storing this data in their computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard their computer system—and Plaintiff's and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes so they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

105. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would at some point try to access Defendant's databases of PII.

106. After all, PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members. Thus, Defendant knew, or should have known, the importance of exercising reasonable care in handling the PII entrusted to it.

107. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

108. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and Class Members, which is recognized by laws and regulations including but not limited to the FTC Act, state statutory law, and common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

109. Defendant failed to take appropriate measures to protect the PII of Plaintiff and the Class. Any purported safeguards that Defendant had in place were wholly inadequate.

110. Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class Members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite known data breaches across several industries, and allowing unauthorized access to Plaintiff's and the other Class Members' PII.

111. The failure of Defendant to comply with industry and federal regulations evinces Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII.

112. But for Defendant's wrongful and negligent breach of their duties to Plaintiff and the Class, PII would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the PII of Plaintiff and the Class and all resulting damages.

113. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII. Defendant knew or should have known that its systems and technologies for processing and securing the PII of Plaintiff and the Class had security vulnerabilities.

114. As a result of this misconduct by Defendant, the PII and other sensitive information of Plaintiff and the Class was compromised, placing them at a greater risk of identity theft and their PII being disclosed to third parties without the consent of Plaintiff and the Class.

115. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by Defendant's data breach; (x) the value of the unauthorized access to their PII permitted by Defendant; and (xi) any nominal damages that may be awarded.

116. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

117. Defendant's negligent conduct is ongoing, in that it still possesses Plaintiff's and Class Members' PII in an unsafe and insecure manner.

118. Plaintiff and Class Members are entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

119. Plaintiff restates and reallege paragraphs 1 through 101 above as if fully set forth herein.

120. Plaintiff and Class Members were required to provide their PII to Defendant as a condition of receiving Defendant's products and services.

121. Plaintiff and Class Members entrusted their PII to Defendant. In doing so, Plaintiff and the class entered into implied contracts with Defendant by which it agreed to safeguard and protect such information to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the class if their data had been breached and compromised or stolen.

122. In entering into the implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and

regulations and were consistent with industry standards, and that Defendant would thoroughly vet and select vendors that adequately protect PII.

123. Implicit in the agreement between Plaintiff and Class Members and Defendant was Defendant's obligation to: (a) take reasonable steps to safeguard that PII, including through proper vetting of third party vendors to whom PII is provided; (b) prevent unauthorized disclosure of the PII; (c) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (d) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses; and (e) retain or allow third parties to retain PII only under conditions that kept such information secure and confidential.

124. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant on the other, is demonstrated by their conduct and course of dealing. Defendant required Plaintiff and Class Members to provide their PII as a condition of receiving Defendant's products and services. Plaintiff and Class Members accepted the offers and provided their PII.

125. In accepting the PII, Defendant understood and agreed that it was required to reasonably safeguard and otherwise ensure protection of the PII from unauthorized access or disclosure.

126. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant that Defendant would keep, and require the third-party vendors it selects to house PII to keep, their PII reasonably secure.

127. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor and ensure that the PII entrusted to it would remain

protected by reasonable data security measures and remain confidential, either in the hands of Defendant or one of its vendors.

128. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant by providing their PII at Defendant's request.

129. Defendant breached the implied contracts made with Plaintiff and the class by failing to safeguard and protect their PII, by entrusting the PII to a vendor that fails to safeguard PII, by failing to delete the PII of Plaintiff and the Class or requiring vendors to delete information once the relationship ended, and by failing to provide accurate notice to them that their PII was compromised as a result of the Data Breach.

130. As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

131. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

132. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data monitoring procedures; (ii) evaluate, audit, and improve its processes for vetting third party vendors and the selection processes for vendors to which Defendant provides sensitive PII; (iii) submit to future annual audits of those systems and monitoring procedures; (iv) bolster its IT security measures; and (v) immediately provide or continue providing adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

133. Plaintiff restates and realleges paragraphs 1 through 101 above as if fully set forth

herein.

134. Plaintiff and Class Members conferred a benefit on Defendant by entrusting their PII to Defendant from which it derived profits.

135. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

136. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

137. Defendant acquired the PII through inequitable means in that Defendant failed to disclose the inadequate security practices, previously alleged, and failed to maintain adequate data security.

138. If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to disclose their data to Defendant.

139. Plaintiff and Class Members have no adequate remedy at law.

140. As a direct and direct an proximate result of Defendant's conduct, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data

Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures or further entrustment to inadequate third party vendors so long as Defendant fails to undertake appropriate and adequate measures to protect the PII; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by Defendant's data breach; (x) the value of the unauthorized access to their PII permitted by Defendant; and (xi) any nominal damages that may be awarded.

141. Plaintiff and Class Members are entitled to restitution and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

142. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

143. Plaintiff restates and realleges paragraphs 1 through 101 above as if fully set forth herein.

144. Defendant became the guardian of Plaintiff's and Class Members' PII. Defendant became a fiduciary, created by its undertaking and guardianship of Plaintiff's and Class Members' PII, to act primarily for their benefit. This duty included the obligation to safeguard Plaintiff's and Class Members' PII and to timely detect and notify Plaintiff and Class Members in the event of a data breach.

145. Defendant knowingly undertook the responsibility and duties related to the possession of Plaintiff's and Class Members' PII for the benefit of Plaintiff and Class Members in order to provide Defendant's products and services to Plaintiff and Class Members.

146. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members within the scope of its relationship with them. Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to properly protect PII. Defendant further breached its fiduciary duties by failing to timely detect the Data Breach and notify and/or warn Plaintiff and Class Members of the Data Breach.

147. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in Defendant's possession

and is subject to further unauthorized disclosures so long as it fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

148. As a direct and proximate result of Defendant's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT V
## MASSACHUSETTS CONSUMER PROTECTION LAW, CH. 93A, § 1, *et seq.*
## (On behalf of Plaintiff and the Class)

149. Plaintiff restates and realleges paragraphs 1 through 101 above as if fully set forth herein.

150. Plaintiff brings this count under Massachusetts law, individually and on behalf of the members of the Class.

151. Defendant was and are engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

152. The Massachusetts Consumer Protection Law ("Massachusetts CPL") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mass. Gen. Laws ch. 93A, § 2.

153. Defendant's violations of the Massachusetts CPL occurred repeatedly in its trade or practice—including the design, imposition, maintenance, and representation of its data privacy and security measures supposedly imposed to protect Plaintiff's and Class Members' PII.

154. Defendant, through its agents, employees, and/or subsidiaries, violated the Massachusetts CPL by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the data privacy and security measures to safeguard Plaintiff's and Class Members' PII from access and disclosure to unauthorized third parties.

155. Defendant had an ongoing duty to Plaintiff and Class Members to refrain from unfair or deceptive practices under the Massachusetts CPL in the course of its business.

156. Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and/or suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the PII of Plaintiff and Class Members were protected from unauthorized disclosure and access. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did, in fact, deceive reasonable consumers, including Plaintiff and Class Members, about the true safety of Plaintiff's and Class Members' PII, and the reliability and quality of Defendant's data security measures.

157. Defendant intended for Plaintiff and Class Members to rely on its misrepresentations, omissions, and concealments—which it did by assuring in its Privacy Policy and data security documentation on the Fidelity website that Defendant protected Plaintiff's and Class Members' PII by imposing technical and non-technical measures that supposedly complied with industry standards.

158. Plaintiff's and Class Members' reliance was reasonable, as they had no way of discerning that Defendant's representations were false and misleading or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel Defendant's deception on their own.

159. Had they known the truth about the defective and substandard nature of Defendant's data privacy and security measures, Plaintiff and Class Members would not have engaged with and paid Defendant for its services, or they would have paid significantly less for them.

160. As a direct and proximate result of Defendant's deceptive practices, Plaintiff and Class Members have sustained economic injury and loss—either by having their PII leaked onto and sold on the dark web, paying out-of-pocket costs for fraudulent charges as a result of fraudsters' use of Plaintiff's and Class Members' PII stolen in the Data Breach, and additional measures undertaken by Plaintiff and Class Members needed to ensure the privacy and security of their PII, such as credit freezes, purchasing credit monitoring services, and locking of outgoing funds from their Fidelity investment accounts.

161. Defendant's violations present a continuing risk to Plaintiff and Class Members, as well as to the general public because the PII leaked in the Data Breach remains out in the open Internet and on the dark web for anyone to access and take advantage of. Defendant's unlawful acts and practices complained of herein affect the public interest.

162. Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff and Class Members seek an order enjoining Defendant's unfair and/or deceptive acts or practices, any such orders or judgments as may be necessary to restore to them any money acquired by unfair and or deceptive conduct, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the Massachusetts CPL.

**<u>COUNT VI</u>**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiff and the Class)**

163. Plaintiff restates and realleges paragraphs 1 through 101 above as if fully set forth

herein.

164. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

165. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injuries as result of the compromise of his PII and remain at imminent risk that further compromises of their PII will occur in the future.

166. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: (a) Defendant owes a legal duty to secure PII and to timely notify impacted individuals of a data breach under the common law, Section 5 of the FTC Act, and various state statutes, and (b) Defendant continues to breach this legal duty by failing to employ reasonable measures to secure PII in its possession.

167. This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect PII in Defendant's possession and control.

168. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff and Class members will not have an adequate remedy at law because many of the

resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

169. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

170. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the class, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as the class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, including but not limited to an Order:

a. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

b. requiring Defendant to protect, including through encryption, all data collected

through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

c. requiring Defendant to delete and purge the Personal Information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

d. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Personal Information;

e. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

f. prohibiting Defendant from maintaining Plaintiff's and Class Members' Personal Information on a cloud-based database until proper safeguards and processes are implemented;

g. requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

h. requiring Defendant to conduct regular database scanning and security checks;

i. requiring Defendant to monitor ingress and egress of all network traffic;

j. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees'

respective responsibilities with handling Personal Information, as well as protecting the Personal Information of Plaintiff and Class Members;

k. requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

l. requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated;

m. appointing an independent and qualified cyber auditor to monitor Defendant's cyber hygiene, to be funded by Defendant;

n. requiring Defendant to meaningfully educate all Class Members about the threats that they face because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

o. providing or extending credit monitoring services and similar services to protect against all types of identity theft.

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

DATED: November 8, 2024

Respectfully Submitted,

*/s/ Garrett D. Lee*
Garrett D. Lee, BBO# 669603
**MORGAN & MORGAN**
155 Federal Street, 15th Floor
Boston, MA 02110
813-223-0854
glee@forthepeople.com

John A. Yanchunis*
jyanchunis@forthepeople.com
Ronald Podolny*
ronald.podolny@forthepeople.com
Antonio Arzola, Jr.*
ararzola@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 275-4736

***Counsel for Plaintiff and the Class***
**Pro hac vice* to be filed